NOT DESIGNATED FOR PUBLICATION

No. 123,641

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FRATERNAL ORDER OF POLICE, NO. 7, INC.,
*Appellant*,

v.

CITY OF HUTCHINSON, KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed March 4, 2022. Affirmed.

*Mark J. Galus*, *Donald R. Aubry*, and *Matthew R. Huntsman*, of Bukaty, Aubry & Huntsman, Chtd., of Overland Park, for appellant.

*Miriam E. C. Bailey* and *Denise M. Delcore*, of Polsinelli PC, of Kansas City, Missouri, for appellee.

Before CLINE, P.J., GREEN, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: Officer Jonathan Suda was terminated from the Hutchinson Police Department following proceedings under the grievance procedure in a collective bargaining agreement between the City of Hutchinson (City) and the Fraternal Order of Police, No. 7 (Union). Following an unsuccessful appeal to the district court under K.S.A. 60-2101(d), the Union appeals to us, arguing that in upholding Suda's termination the City (1) acted outside the scope of its authority, (2) rendered a decision that was not supported by substantial evidence, and (3) was arbitrary or capricious.

1

The events that precipitated Suda's termination began on the evening of February 25, 2018, when the Hutchinson Police Department received numerous calls reporting an erratic driver who failed to maintain a single lane of traffic, drifted into the middle of the road, and swerved across the median and nearly hit an oncoming truck. The car belonged to off-duty Hutchinson Police Officer Anna Ruzhanovska.

Suda was one of the responding officers. He initially stated that he remembered reading the details of the reports coming into dispatch while he was on his way to the scene but later contended that he only knew that there were some traffic complaints. When Suda arrived Ruzhanovska had already been stopped by another officer. He saw that Ruzhanovska had her head out of the window, was slumped over on the other officer's arm, and was visibly upset and crying. Suda turned off his body camera to "keep her personal matters private." In a later interview Suda claimed that he had turned off his body camera because Ruzhanovska was a fellow officer, and the stop was not a "citizen contact," so body cameras were not required. He also later claimed that he turned off his camera at the direction of another officer at the scene.

After turning off his camera, Suda joined Ruzhanovska in the front seat of the car to "figure out what was wrong." He later claimed that he got into the car to check for the odor of alcohol because he initially presumed that Ruzhanovska was driving under the influence. But he retracted that claim and stated he never suspected Ruzhanovska was impaired and that he never thought the stop warranted a DUI investigation.

Though Ruzhanovska appeared to be "confused" and "out of it," Suda maintained there were no indicators that she was under the influence of drugs or alcohol. Suda did not require Ruzhanovska to perform any field sobriety tests. Instead, he left his patrol car

behind and drove Ruzhanovska in her car to the law enforcement center. He claimed he did so as instructed by a superior officer.

The City retained Douglas Duckett to conduct an internal investigation into the matter and placed Suda on administrative leave with pay pending the outcome of the investigation. Suda was informed that he would be interviewed and he would have to respond truthfully to any questions posed to him during the investigation.

Upon completion of the investigation, Duckett concluded that (1) Suda's failure to perform field sobriety testing constituted "very serious and unethical misconduct"; (2) his decision to turn off his body camera clearly violated policy and his explanation for doing so was "transparently absurd and disingenuous"; and (3) Suda was deceptive and misleading during the investigation.

Based on the investigation report, the Hutchison Police Chief terminated Suda's employment, concluding that Suda had committed three violations:

> "(1) During the February 25, 2018, traffic stop, [Suda] deliberately shut off [his] body camera in violation [of] _General Order 67.1 Use of Audio and Video Equipment_.

> "(2) During the February 25, 2018 traffic stop, [Suda] failed to conduct impairment testing in violation of _General Order 63.2 Traffic Enforcement_.

> "(3) During the investigatory interview with Douglas Duckett on September 5, 2018, [Suda] provided untruthful and intentionally evasive, contradictory and deceptive responses in violation of _General Order 1.10_ and the _Employee Handbook Standards of Conduct policy_."

Suda sought review of the Chief's termination decision under the collective bargaining Memorandum of Understanding (MOU) between the City and the Union.

3

Under the MOU, police officers may only be fired for "just cause which shall include, but is not limited to, violations of Departmental Rules and Regulations or Special Orders." The MOU provides for the following grievance procedure:

- **Step I**: After termination, the Union may file an official grievance on behalf of the officer to the Police Chief, who is then required to provide a written response.

- **Step II**: If the matter is not settled at that point, the Union may then file a grievance with the City Manager, who must then return a written response or act on the grievance.

- **Step III**: If the matter remains unsettled, an arbitrator may be appointed "to hear and consider evidence submitted by the parties and to thereafter make written findings of fact and a disposition of the grievance which shall be advisory in nature." The arbitrator's "advisory decision" is then sent to the City Manager, who is required to render a written decision.

- **Step IV**: Either the Union or the City may appeal the City Manager's decision to the governing body—here, the City Council—which renders a "final" decision on the grievance.

The Union initiated this grievance procedure by filing a grievance with the Police Chief, claiming that Suda had been fired without proper cause. The Chief responded by affirming his decision to terminate Suda.

The Union then submitted the matter to the City Manager, and the City Manager in turn rendered his own written decision, concluding that Suda had been terminated for proper cause because he had violated department procedure by failing to conduct field

4

sobriety tests; shutting off his body camera at the scene; and giving evasive, contradictory, and deceptive statements during the investigation.

The Union then invoked the arbitration provision in the grievance procedure. The parties filed briefs and submitted evidence, and the arbitrator conducted interviews to address whether Suda was terminated for just cause and, if not, what the remedy should be.

The arbitrator found clear and convincing evidence to support the City's allegations regarding Suda turning off his body camera and failing to perform field sobriety tests. But with respect to the City's final allegation—which the arbitrator reframed as "Did the grievant lie to investigators"—the arbitrator failed to find clear and convincing support in the evidentiary record. He concluded that Suda "could have been more forthcoming in the interview," but "the evidence fell short of establishing by clear and convincing evidence that [he] lied anyway." The arbitrator determined that because there was not clear and convincing evidence that Suda lied, the evidence was insufficient to warrant termination. The arbitrator recommended that the City reinstate Suda to his former position, but without back pay or any contractual benefits.

The arbitrator's report was sent to the City Manager. After reviewing the arbitrator's decision and award, the City Manager rejected the arbitrator's conclusion about Suda's truthfulness and stood by his original decision, stating that "substantial and overwhelming evidence clearly supports that [Suda] was . . . untruthful, intentionally evasive, contradictory, and deceptive during the City's investigation and committed multiple instances of severe misconduct."

The Union appealed to the City Council. The parties presented arguments to the council but no new evidence. The record before the City Council consisted of the evidence and documents already in the record before the City Manager. After reviewing

5

the evidence and hearing the arguments and statements of counsel, the City Council unanimously upheld the City Manager's decision to terminate Suda.

The Union appealed to the district court under K.S.A. 60-2101(d), arguing that the City Council, in finding that Suda acted dishonestly during the investigation, exceeded its authority because the arbitrator was the sole fact-finder under the MOU. The Union also contended that the City Council's decision was not supported by substantial evidence and that it was otherwise arbitrary or capricious. The district court denied relief on the Union's petition, and this appeal by the Union followed.

ANALYSIS

*The City Acted Within the Authority Given to It in the MOU Grievance Procedure*

The Union's first contention is that the City Council exceeded its authority under the MOU by not deferring to the arbitrator who, the Union claims, was the sole fact-finder. The Union argues in its appellate brief: "It was not the City's job to reassess this evidence; its job was to decide whether the remedy—the disposition of the grievance—was correct." According to the Union, the City Council should have adopted wholesale the arbitrator's findings of fact because the MOU provides that the arbitrator's factual findings were binding, although his recommended disposition was not.

The City maintains that the MOU unambiguously provides that the arbitrator's suggested disposition of the grievance and factual findings are merely advisory. Thus, the City acted within its authority when it departed from the arbitrator's factual findings regarding Suda's dishonesty and upheld his termination.

The Union sought relief from the district court under K.S.A. 60-2101(d). The Union's action under this statute called for the district court to review the City's dismissal

6

of Suda, with or without additional evidence, to determine whether the City's action "was within [its] scope of authority; was substantially supported by the evidence; or was fraudulent, arbitrary, or capricious." *Denning v. Johnson County*, 299 Kan. 1070, 1075, 329 P.3d 440 (2014). In our review, we apply these same standards de novo without any deference to the district court's decision. We review the City's decision to terminate Suda "as though the appeal had been made directly to the appellate court." 299 Kan. at 1075-76. In doing so, our interpretation of the MOU is a matter of law over which our review is unlimited. See *Jayhawk Racing Properties, LLC v. City of Topeka*, 313 Kan. 149, 154, 484 P.3d 250 (2021).

Because the MOU is a contract between the parties, we examine its arbitration provision using the usual rules and canons of contract interpretation. *City of Lenexa v. C.L. Fairley Const. Co.*, 245 Kan. 316, 319, 777 P.2d 851 (1989). The primary rule of contract interpretation is to determine the intent of the parties. If we can determine that intent from the language of the contract, we do so without applying the rules of construction. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). In interpreting the contract, we do not isolate on any one sentence, but rather consider the instrument as a whole. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). Finally, the burden is on the Union to demonstrate that the City's decision to terminate Suda was in error. See *Stueckemann v. City of Basehor*, 301 Kan. 718, 750, 348 P.3d 526 (2015).

As a preliminary matter, the parties address the district court's decision and the court proceedings and analysis that led to it. As noted above, our standard of review is de novo; that is, we review the case as if the Union's appeal had been made directly to us rather than first being made to the district court. Accordingly, whatever happened before the district court is immaterial to our consideration of the Union's claims in this appeal.

The purpose of the grievance procedure is spelled out in the MOU as follows: "The purpose of this grievance procedure is to settle, as quickly as possible, disputes concerning the interpretation, application and enforcement of the express provisions of this Agreement." We have already listed the steps to be followed in the grievance procedure. Where the Union contends the process ran off the rails was in Step III and Step IV. In Step III of the grievance procedure, the City Manager rejected the arbitrator's conclusion that Suda should not be terminated and, contrary to the arbitrator's report, determined that Suda was "untruthful, intentionally evasive, contradictory, and deceptive during the City's investigation." In Step IV, the City Council made its final decision to uphold Suda's termination based on all three charges, finding, with respect to the third charge, that Suda's conduct was evasive, misleading, duplicitous, and dishonest.

The Union concedes that the arbitrator's disposition of the grievance—that Suda be reinstated without back pay or benefits—is merely a recommendation and advisory in nature. Rather, it contends that the arbitrator's findings of fact are not advisory but are binding on the parties. Thus, it argues, the City Manager and the City Council had no authority to engage in their own independent fact-finding in rendering a decision on Suda's grievance.

Our first task is to examine the language of the MOU to determine the intent of the parties. In doing so, we consider the document as a whole but we necessarily focus on Steps III and IV of the MOU.

Step III comes into play if the Union is unsatisfied with the City Manager's initial action on the grievance in Step II. If the matter is not settled based on the City Manager's decision, the parties move to Step III—proceedings before an arbitrator. If the arbitrator's report does not settle the matter, the parties move to Step IV—a final decision by the City Council.

8

"**Step III**

"If the grievance is not settled in Step II, the Bargaining Unit Grievance Committee shall give written notice to the Human Resources Director for referral of the grievance to an arbitrator . . . .

. . . .

"(e) Except when an agreed statement of facts is submitted by the parties, it shall be the duty of the arbitrator to hear and consider evidence submitted by the parties and to thereafter make written *findings of fact* and a *disposition* of the grievance which shall be advisory in nature. The arbitrator shall submit to the parties his/her *decision* in writing within thirty (30) calendar days . . . .

. . . .

"(h) Upon receipt of an *advisory decision* by the arbitrator, the City Manager shall, withing seven (7) calendar days, render a written decision.

"**Step IV**

"The Bargaining Unit or the Employer may appeal the City Manager's decision to the Governing Body of the Employer. . . .

. . . .

"The Governing Body shall render a decision on the grievance. . . . The decision of the Governing Body shall be final." (Emphases added.)

We also note the applicable provision of the Hutchison Police Department's General Order 1.10 and its Standards of Conduct 401:

General Order 1.10

"**D.     Conduct of Officers**

. . . .

"9. Officers are required to speak the truth at all times whether under oath or not. In cases where they are not allowed by the rules of service to divulge facts withing their knowledge, they shall say they are not permitted to discuss the subject.

. . . .

9

"14. An officer shall not fabricate, withhold or destroy evidence of any kind.

. . . .

"**J.      Duty to Report**

"[Officers] shall not repress, conceal or distort the facts in any incident."

Standards of Conduct 401

"The following is a list of offenses for which an employee may receive corrective action up to and including termination. . . . Examples of unacceptable conduct include:

. . . .

"•  Making false or untrue statements to management, fellow employees or members of the public regarding work-related matters;

"•  Impeding an internal investigation regardless of whether the employee is a witness or the focus of the investigation. Such actions include:  refusing to cooperate, withholding relevant information, destruction of records, departing from the truth or providing false or misleading information."

Under K.S.A. 75-4330(b), in the context of public employer-employee relations, the parties were free to determine whether the arbitrator's role would be advisory or binding. We conclude here that the express terms of the MOU evidence the intent of the parties that the arbitrator serve in an advisory role.

To begin, there is no language in the MOU that explicitly states that the arbitrator is to act as the only fact-finder. Examining Step III as a whole, it is clear to us that both the arbitrator's findings of fact and his disposition are advisory in nature.

The arbitrator is to make findings of fact and a disposition "which shall be advisory in nature." The phrase "shall be advisory" does not exclude the arbitrator's

10

findings of fact. To the contrary, we conclude that "shall be advisory" modifies and includes both the arbitrator's findings of fact and his disposition. We find support for this in the requirement in Step III that the arbitrator must submit his decision within 30 days. It is this decision—the arbitrator's "*advisory decision*"—which the City Manager reviews and then renders his own decision on the matter.

We cannot conceive that the parties intended that in issuing his decision the arbitrator would submit only his recommended disposition of reinstatement without supporting facts. The "advisory decision" the arbitrator sends to the City Manager necessarily includes the arbitrator's findings of fact, which the arbitrator used to support his recommended disposition.

That is certainly what happened here. The "Decision and Award of Arbitrator" sent to and received by the City Manager—the *advisory decision* described in Step III(h)—includes both the arbitrator's findings of fact and his proposed disposition. Together these make up the advisory decision described in the MOU.

The City Manager treated the arbitrator's decision as advisory as specified in Step III(h) in deciding that during the City's investigation Suda was "untruthful, intentionally evasive, contradictory, and deceptive."

The relevant charge against Suda was:

"(3) During the investigatory interview with Douglas Duckett on September 5, 2018, [Suda] provided untruthful and intentionally evasive, contradictory and deceptive responses in violation of *General Order 1.10* and the *Employee Handbook Standards of Conduct policy*."

11

The City Manager's characterization of Suda being, among other things, "untruthful," is consistent with our Supreme Court's holding in *Denning*, in which the Supreme Court cited with approval the Court of Appeals statement: "'Half truths are untruths if they infer a conclusion different from what would have been concluded had the whole truth been told.'" 299 Kan at 1085. Moreover, the City's Standards of Conduct 401 recognizes the distinction between a false and an untrue statement and identifies unacceptable conduct to include "departing from the truth *or* providing false *or* misleading information." (Emphases added.) The City Council likewise treated the claim of untruthfulness consistent with *Denning* in unanimously confirming the City Manager's decision upholding Suda's termination.

The Union argues that this interpretation of the MOU renders arbitration a meaningless exercise. We disagree. To the contrary, in rendering an advisory decision the arbitrator facilitates the objective of the grievance process:  "to settle, as quickly as possible, disputes concerning the interpretation, application and enforcement of the express provisions of this Agreement."

None of the City Council members was an attorney. We think it is safe to say that membership on the City Council of the City of Hutchinson is a part-time position. Moreover, it is apparent that the termination of employment for police officers is not an issue that routinely comes before the Council at its regular meetings. Here, the matter was taken up at a specially set Appeal Hearing.

The use of an arbitrator facilitates the collection of evidence and the taking of oral testimony that could not, within reason, be undertaken by lay, part-time Council members or by the City Manager who is charged with the day-to-day overall administration of the City's business. Besides, not every employee termination case need come before the Council. The City Manager has the right to review the record, including the arbitrator's report and the statements of counsel made to the arbitrator, to determine the controlling

facts and to arrive at a just decision that, one would hope, satisfies the parties and avoids further proceedings before the City Council. The council only hears and decides termination cases when one of the parties is unsatisfied with the decision of the City Manager. In doing so, the council looks to the record established before the arbitrator. Thus, the arbitrator serves a vital function in the disposition of involuntary terminations without having the final say on the facts of the case.

Accordingly, we conclude that neither the City Manager under Step III nor the City Council under Step IV exceeded the authority given under the grievance procedure to treat the entirety of the arbitrator's "Decision and Award" as an "advisory decision."

*The City's Decision was Based on Substantial Evidence and was neither Arbitrary nor Capricious*

When faced with a claim that there is no substantial evidence to support a finding upon which the appealed decision rests, we typically examine the record for evidence that a reasonable person could accept as being adequate to support the challenged finding. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). In doing so, we view the evidence in the light favoring the prevailing party below—here, the City—and we accept as true the evidence and any inference drawn from the evidence that supports the City's finding, to the exclusion of any conflicting evidence or inference. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1196, 221 P. 3d 1130 (2009); *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Here, it is the Union's burden to show that the evidence was insufficient. See *Stueckemann*, 301 Kan. at 750 ("[A] common thread running throughout challenges to decisions made by political subdivisions or administrative agencies—regardless of the grounds—is that the challenger has the burden to demonstrate the decision should be reversed or declared void.").

13

Rather curiously, the Union does not address in its appellate brief the specific finding about Suda's untruthfulness which it now challenges; nor does the Union demonstrate how the City's finding fails to satisfy the standards we have just recounted. It merely describes its substantial evidence claim as follows:

"[T]he Arbitrator—the sole finder of fact—found that the evidence was sufficient to justify two violations by Suda, but was insufficient to support a charge of dishonesty. The City Manager's decision to reject this finding of fact and uphold Suda's termination anyway—then ratified by the City Council—means that the termination decision was not based on substantial competent evidence."

This contention is built upon what we have determined to be a false premise: that under the MOU the authority to make findings of fact regarding a grievance rests solely with the arbitrator. But because, as we have shown, the arbitrator's decision is advisory in nature, the City is not bound by the arbitrator's findings. Thus, any deviation from the arbitrator's findings is not on its face error.

The Union's appellate brief reads as a reply brief to the brief the City filed in the district court. It challenges the City's assertions before the district court about the time and effort that went into the City Council's decision. It never addresses the actual matter at issue: whether substantial evidence supported the City's findings. An issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Moreover, a point raised incidentally in a brief—such as the Union's challenge to the sufficiency of the evidence but not argued—is also deemed abandoned. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

The Union's challenge to the sufficiency of the evidence fails.

Finally, the Union grounds its claim that the City acted arbitrarily or capriciously on the contention that the City's decision was not supported by substantial evidence and

14

was "without adequate determining principles." We have already addressed the substantial evidence claim. It does not support a conclusion that the City acted arbitrarily or capriciously.

Once again, the entirety of the Union's argument addresses the proceedings before the district court. As we noted earlier, we address the issues on appeal de novo without any deference to the district court's decision. We review the City's decision to terminate Suda "as though the appeal had been made directly to the appellate court." *Denning*, 299 Kan. at 1075-76.

In *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 271, 241 P.3d 15 (2010), the court stated: "'This court has defined "arbitrary" to mean without adequate determining principles, not done or acting according to reason or judgment; . . . and "capricious" as changing, apparently without regard to any laws.'" Here, the Union makes no attempt to show that the City's conduct falls within the definition of arbitrary and capricious conduct as defined in *Robinson*.

The Union does cite *U.S.D. No. 434 v. Hubbard*, 19 Kan. App. 2d 323, 328, 868 P.2d 1240 (1994). The Union claims that *Hubbard* supports its position regarding the binding effect of the arbitrator's findings. It does not. *Hubbard* involved a tenured teacher who was afforded a due process hearing before a committee to determine if there were adequate grounds to terminate him. The role of the committee in *Hubbard* was defined by statute. In our case, the role of the arbitrator is defined by contract and we have determined that under the contract the decision of the arbitrator is advisory and not binding on the City. *Hubbard* does not support the Union's position.

The Union has failed to meet its burden of establishing that the City acted outside the scope of its authority, that the City's decision was not based on substantial evidence, and that the City's actions were arbitrary or capricious.

Affirmed.